UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| $118,524.16 SEIZED FROM IBERIA | § | CIVIL ACTION NO. |
| BANK CHECKING ACCOUNT ENDING | § | |
| IN *1014, | § | |
| Defendant. | § | |

**<u>VERIFIED COMPLAINT FOR FORFEITURE IN REM</u>**

The United States of America files this action for forfeiture and alleges upon information and belief:

<u>*Nature of Action*</u>

1.      This is an action to forfeit property to the United States.

<u>*Jurisdiction and Venue*</u>

2.      This Court has subject-matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3.      Venue is proper in the Southern District of Texas under 28 U.S.C. §§ 1355, 1391, and 1395.

<u>*Defendants in Rem*</u>

4.      The Defendant Property is $118,524.16 seized from Iberia Bank checking account ending in 1014. The Defendant Property was seized on or about February 9, 2022 and is in the custody of the United States Marshals Service.

*Statutory Basis for Forfeiture*

5.      This civil forfeiture action *in rem* is brought under 21 U.S.C. § 881 which provides

for the forfeiture of all moneys, negotiable instruments, securities, or other things of value

furnished or intended to be furnished by any person in exchange for a controlled substance or listed

chemical in violation of 21 U.S.C. § 801 *et seq*., all proceeds traceable to such an exchange, and

all moneys, negotiable instruments, and securities used or intended to be used to facilitate any

violation of 21 U.S.C. § 801 *et seq*.

6.      This civil forfeiture action *in rem* is also brought under 18 U.S.C. § 981(a)(1)(A)

which provides for the forfeiture of any property, real or personal, involved in a transaction or

attempted transaction in violation of 18 U.S.C. § 1956, laundering of monetary instruments; and

18 U.S.C. § 1957, engaging in monetary transactions with proceeds derived from specific unlawful

activity. This civil forfeiture action *in rem* is also brought under 18 U.S.C. § 981(a)(1)(C) which

provides for the forfeiture of property which constitutes or is derived from proceeds traceable to a

specified unlawful activity. A violation of 21 U.S.C. §§ 841, 846 is a "specified unlawful activity"

pursuant to 18 U.S.C. §1956(c)(7).

7.      With regard to the civil forfeiture of fungible property, 18 U.S.C. § 984 provides

that funds deposited into the same financial account as the property involved in the offense that is

the basis for the forfeiture shall be subject to forfeiture so long as the forfeiture action is

commenced within one year from the date of the offense.

*Statutory Basis for Seizure*

8.      Property subject to forfeiture may be seized by a civil warrant issued "in the same

manner as provided for a search warrant under the Federal Rules of Criminal Procedure." 18

U.S.C. § 981(b)(2). Property subject to forfeiture includes funds used or exchanged for a

2

controlled substance and proceeds traceable to such an exchange. 21 U.S.C. §§ 853, 881(a)(6). In addition, 18 U.S.C. §§ 981(a)(1)(A), 982(a)(1) provides for the forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [S]ection 1956, 1957, or 1960 of this title, or any property traceable to such property."

*Background*

9.      SHELDON DOUNN ("DOUNN") used his company Pharmacy Rx Consultants LLC ("PRC") to broker the sale of opioids for wholesaler WHOLESALE RX dba Tyler Pharmaceuticals ("WHOLESALE RX"). COURTNEY P. ALLISON aka COURTNEY ALLISON ROTENBERRY ("ROTENBERRY") is the lead salesperson for WHOLESALE RX. RICHARD OSBORNE aka DICK OSBORNE ("OSBORNE") is the President of WHOLESALE RX. JUSTIN ROTENBERRY ("J. ROTENBERRY") is the CEO. MARY BETH BRICE ("BRICE") is a salesperson at WHOLESALE RX. STEVE STAGGS ("STAGGS"), VENITA OSBORNE ("VENITA OSBORNE") and CHRIS FONTE ("FONTE") are employees at WHOLESALE RX.

10.     WHOLESALE RX and others known and unknown to the investigation have committed and are committing the following federal offenses which render the Defendant Property subject to forfeiture: (collectively the "**SUBJECT OFFENSES**"):

a.      21 U.S.C. § 841 – possession with intent to distribute and dispense, and distribution and dispensing, of controlled substances;

b.      21 U.S.C. § 843(a)(4)(A) – furnishing false material information in, or omitting any material information from, any application, report, record, or other document required to be made, kept, or filed under Subchapter I of Title 21, United States Code;

c.      21 U.S.C. § 843(b) – use of a communications facility to further the commission of a felony controlled substance offense;

d.      21 U.S.C. § 846 – conspiracy or attempt to commit any offenses in Subchapter I of Title 21, including conspiracy to possess with intent to distribute and dispense, and to distribute and dispense, controlled substances;

e.      21 U.S.C. § 856 – maintaining a place for manufacture, distribution, or use of controlled substances;

f.      18 U.S.C. § 1956 – laundering of monetary instruments and conspiracy to do so;

3

g.   18 U.S.C. § 1957 – engaging in monetary transactions involving property derived from specified unlawful activity;

h.   18 U.S.C. § 371 – conspiracy to defraud the United States (in this instance, the DEA);

i.   21 U.S.C. §§ 832(a), 842(a)(5), and 842(c)(2)(A) – failure to report suspicious orders; and

j.   18 U.S.C. § 1001 – false statements.

11.   DOUNN was hired as an independent contractor to serve as a sales consultant for certain wholesalers (often called brokers), including WHOLESALE RX, to bolster the wholesalers' internal sales forces or to supplant them entirely. In exchange for facilitating these sales, DOUNN was paid a commission, usually a percentage of the sale he brokered. DOUNN worked primarily with Houston-area pill-mill pharmacies to maximize these pharmacies' buying potential from wholesalers for commonly abused and diverted drugs—most often the opioids oxycodone, hydrocodone, and hydromorphone ("Subject Opioids")—along with drugs that potentiate the "high" received by the user, like carisoprodol, benzodiazepines, and promethazine with codeine ("Opioid Potentiators").[1] Opioid potentiators are drugs that are utilized to enhance the effects of the opioid.

12.   The deals DOUNN brokered and WHOLESALE RX sold were overwhelmingly for the most powerful, short-acting strengths of these drugs. From 2015 through 2021, WHOLESALE RX distributed approximately 4.9 million dosage units (pills) of the most potent, short-acting strengths of the Subject Opioids to Houston-area pharmacies. Many of the owners, agents, and employees of these Houston-area pharmacies have either been criminally charged in the Southern District of Texas or are under investigation for violations of Title 21. WHOLESALE RX knowingly supplied Subject Opioids with the knowledge that those drugs will be illegally

---

[1] "Houston-area," as discussed here, refers to Texas counties Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

diverted, and WHOLESALE RX received payment from the proceeds generated by those illegal sales.

<u>*Summary of Registrant Requirements*</u>

13.     21 U.S.C. § 822(b) authorizes certain DEA registrants to manufacture or distribute controlled drugs ("822(b)-Registrants"). Such registrants are required by 21 U.S.C. § 823 to maintain effective controls against diversion of these drugs into channels other than legitimate medical, scientific, and industrial channels. They are further required, under 21 U.S.C. § 832, to report suspicious orders to the DEA, and the knowing failure to report such orders (or to make, keep, or furnish any report required by the CSA) is a crime under 21 U.S.C. §§ 832(a), 842(a)(5), and 842(c)(2)(A). On October 23, 2019, the DEA implemented the Suspicious Orders Report System ("SORS"), allowing for a centralized mechanism for 822(b)-Registrants to report the suspicious orders of pharmacies and other registrants to the DEA.

14.     21 C.F.R. § 1304.33 requires 822(b)-Registrants to report all inventories, acquisitions, and dispositions of all Schedule I and II controlled substances, and of Schedule III narcotics, to DEA's Automation of Reports and Consolidated Orders System ("ARCOS"). 822(b)-Registrants are required to report to ARCOS transactions with pharmacies, as well as transactions with other manufacturers and distributors. 21 C.F.R. § 1301.74(b) explains that suspicious orders that must be reported to the DEA pursuant to 21 U.S.C. § 832 include "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."

15.     In the context of 822(b)-Registrants, 21 U.S.C. § 841(a)(1) prohibits knowingly and intentionally distributing and dispensing a controlled substance without a legitimate medical purpose. It also prohibits distributing and dispensing a controlled substance outside the usual course of a professional practice, whether that practice is pharmacy, physician, or any other

practice where an individual or an entity may be authorized to legally distribute and dispense controlled substances.

16.    DEA Form 222 ("DEA 222") is a form required by the DEA for each distribution of a Schedule I or II controlled substance. 21 C.F.R § 1305.03. Furthermore, 21 U.S.C. § 828(a) mandates that any registrant receiving Schedule II controlled drugs issue a DEA 222 to the supplier of those drugs, and § 828(d)(1) reflects that DEA 222s may only be issued to DEA registrants. Under § 828(c)(1), registrants are required to keep the DEA 222s received for two years and must make them available for inspection and copying by the DEA. DEA Diversion Investigators often request these forms to be produced by 822(b)-Registrants to determine whether the registrant is diverting controlled substances. The DEA Controlled Substance Ordering System ("CSOS") is an electronic ordering system for controlled substances that provides electronic versions of the DEA 222.

17.    In the context of pharmacies and medical clinics, 21 C.F.R. § 1306.06 governs the filling of prescriptions and provides: "A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice[.]" 21 C.F.R. § 1306.11 provides that a pharmacist may dispense a Schedule II controlled substance "only pursuant to a written prescription signed by the practitioner." Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

18.    The Prescription Monitoring Program ("PMP") is a database of all reported prescriptions for controlled substances that are issued and dispensed in Texas. The Texas

Department of Public Safety ("DPS") maintained the database until September 1, 2016, after which the Texas State Board of Pharmacy ("TSBP") took over. The PMP data is self-reported by pharmacies and searchable by provider, patient, and pharmacy. Texas Law requires that Texas pharmacies report all dispensed controlled substances to the PMP no later than the next business day after the prescription is filled. *See* 22 Tex. Admin. Code § 315.6(a) (2016).

*Relevant Controlled Substances*

19.     21 U.S.C. § 812 establishes five schedules of controlled substances—Schedules I, II, III, IV, and V—based on the drug's potential for abuse, its currently accepted medical use, and the severity of physical or psychological dependence that could result from its abuse. Pharmaceutical controlled substances are listed in Schedules II through V because they are considered drugs for which there is an accepted medical use, but which pose a potential for abuse and addiction. Relevant here:

a.     **Oxycodone** is the generic name for a Schedule II analgesic drug that is typically prescribed for moderate-to-severe pain relief. Due to its potential for addiction, oxycodone prescriptions are generally issued for a modest number of pills to be taken over a short period of time. Oxycodone is a commonly abused and diverted controlled substance.

b.     **Hydrocodone** is the generic name for a narcotic analgesic that was reclassified from a Schedule III to a Schedule II controlled substance as of October 6, 2014. Hydrocodone is sold under several brand names, including Norco. Hydrocodone is a commonly abused and diverted controlled substance.

c.     **Hydromorphone** is an opioid and the generic name for a Schedule II narcotic analgesic that is typically prescribed for moderate-to-severe pain relief when other medication is unsuccessful. Quick-release hydromorphone is marketed under brand name Dilaudid.

d.     **Carisoprodol** is a Schedule IV controlled substance. It is classified as a muscle relaxant. According to the Food and Drug Administration ("FDA"), carisoprodol should only be used for acute treatment periods of up to two to three weeks.  According to recent expert testimony in a similar case, I know that carisoprodol is "a drug of abuse without any proof of efficacy." Additionally, when taken with oxycodone or hydrocodone, carisoprodol can cause an increased sensation of euphoria, which increases its potential for abuse and risk of death.

e.     **Alprazolam** is a Schedule IV controlled substance, classified as a benzodiazepine. Alprazolam is sold under brand name Xanax. Alprazolam is an Opioid Potentiator. The

7

combination of hydrocodone or oxycodone, with carisoprodol and alprazolam, is commonly referred to as the "Houston Cocktail" or the "Holy Trinity," because of its potency and abuse potential.

    f.    **Promethazine with codeine** is a Schedule V controlled substance, and is an opioid produced in the form of a liquid cough syrup. It is also an Opioid Potentiator and highly sought after in the illegal drug market. Promethazine with codeine exposes patients and other users to the risks of opioid addiction, abuse, and misuse, which can lead to overdose and death.

    20.    The Houston area is a national hub where controlled substances are diverted through pill-mill pharmacies to the illegal drug market in Houston and also to interstate Drug Trafficking Organizations ("DTO") for distribution outside of Houston. Pill-mill pharmacies purchase the controlled drugs they divert from 822(b)-Registrants and generally dispense these drugs for no legitimate medical purpose and outside the usual course of professional practice, commonly to members and agents of DTOs. The hallmarks of traditional pill-mill clinics and pharmacies are described in a document, *"Red Flags" Check List for Pharmacies, YOU MIGHT BE A PILL MILL IF…*,[2] that the TSBP provides to pharmacies at initial inspection and again at regular audits.

---

[2] The red flags listed include (emphasis added):

    a.    filling a reasonably discernible <u>pattern of substantially identical prescriptions</u> for the same controlled substances or combinations of controlled substances;

    b.    routinely filling prescriptions for known <u>drugs of abuse, alone or in combination</u>, including opioids, benzodiazepines, muscle relaxants, and psychostimulants;

    c.    routinely filling prescriptions for the <u>highest strength</u> and/or for <u>large quantities</u> of these drugs;

    d.    routinely filling opioid prescriptions by <u>physicians without a pain specialty</u> and <u>clinics not registered as pain management clinics</u>;

    e.    the controlled substance(s) or the quantity of the <u>controlled substance(s) prescribed are otherwise inconsistent with the practitioner's area of medical practice</u>;

    f.    charging <u>above-market rates</u> and accepting <u>mostly/only cash or credit (instead of insurance)</u> for known drugs of abuse;

    g.    routinely filling prescriptions for <u>practitioners located a significant distance away</u>; and

    h.    routinely ordering controlled substances from <u>more than one 822(b)-Registrant</u>.

21.     OPIOID-PATTERN WHOLESALERS approve nearly all pharmacy applications and nearly all of the pharmacies' orders for commonly diverted controlled drugs, so long as the pharmacies abide by certain ordering restrictions that, as a practical matter, do little to detect and deter diversion. Such restrictions include "caps" (i.e., limiting the number of controlled drugs per month that the pharmacy can purchase) and "ratios" (i.e., requiring pharmacies to purchase a set number of non-controlled pills for every controlled pill purchased). These caps and ratios are not mandated by DEA, nor are they effective controls against diversion. Based on investigators' training and experience, using caps and ratios over meaningful due diligence suggests an 822(b)-Registrant's desire *not* to see the illegal dispensing of its pill-mill pharmacy customers and are primarily implemented to attempt to evade detection by law enforcement of illegal diversion.

*Relevant Individuals and Entities*

22.     According to DEA records, WHOLESALE RX was registered with DEA as an 822(b)-Registrant since January 15, 2015, and is located at 7730-A Trinity Road, Suite 101, Cordova, Tennessee 38018.

23.     DOUNN connects pharmacies that display qualities of a pill-mill, primarily in Houston and Florida, with OPIOID-PATTERN WHOLESALERS, including WHOLESALE RX, for the purchase of the Subject Opioids and Opioid Potentiators. According to the Florida Secretary of State, DOUNN established Pharmacy Rx Consultants LLC ("PRC") on or about July 14, 2015. DOUNN is also the sole signatory on PRC's bank account and registered agent as reflected in the company's Articles of Organization. Bank records demonstrate that he is paid by wholesalers and other brokers through PRC on a commission basis, including approximately $658,661.20 in commission from WHOLESALE RX between April 2016 and December 2021.

*ARCOS Analysis*

24.     The ARCOS data reported by WHOLESALE RX reveal suspicious patterns of ordering Schedule II and Schedule III narcotic drugs (i.e., those reportable to ARCOS) by Texas pharmacies, in that the orders deviate substantially from a pattern of ordering that would be expected of a legitimate pharmacy. Legitimate pharmacies typically order a wide array of dosage strengths and types of ARCOS-reportable controlled substances (i.e., Schedule II drugs and Schedule III narcotics). However, the ARCOS data reviewed for pharmacies supplied by WHOLESALE RX reveal mainly orders for ARCOS-reportable drugs that are in the highest demand on the black market: oxycodone, hydrocodone, and hydromorphone. And DOUNN's client pharmacies overwhelmingly purchased from WHOLESALE RX the most potent, short-acting dosage strengths of these drugs commercially available. Additionally, PMP data and evidence obtained by search warrant of several pill-mill pharmacies have shown that most of non-ARCOS reportable controlled substances dispensed by these pharmacies were for Opioid Potentiators like carisoprodol, alprazolam, and promethazine with codeine.

25. ARCOS data confirms these red flags with respect to WHOLESALE RX: from on or about January 1, 2015, through on or about December 31, 2021, greater than 99% of the hydrocodone that WHOLESALE RX distributed in tablet form to all pharmacy customers, was for the highest, short-acting strength of hydrocodone—hydrocodone 10/325 mg; greater than 97% of the oxycodone that WHOLESALE RX distributed in tablet form to all pharmacy customers, was for the highest, short-acting strength of oxycodone—oxycodone 30 mg; and greater than 99% of the hydromorphone that WHOLESALE distributed in tablet form to all pharmacy customers was for the highest, short-acting strength of hydromorphone—hydromorphone 8 mg. To provide context, based upon DEA's review of ARCOS data from in or around January 2020, through in or around August 2020, out of all chain and retail pharmacies in the nation that purchase oxycodone,

these pharmacies purchased the highest, shortest-acting strength, oxycodone 30 mg, only approximately 7% of the time.

*WHOLESALE RX Knowingly Supplied Subject Opioids and Opioid Potentiators for Diversion and Illegal Trafficking*

26.     The investigation into WHOLESALE RX and DOUNN revealed that DOUNN and WHOLESALE RX employees facilitated the sale and purchase of the Subject Opioids and Opioid Potentiators to their pharmacy clients, mostly Houston-area pill-mill pharmacies with the knowledge that those controlled substances would be illegally trafficked.

27.     Several WHOLESALE RX and DOUNN pharmacy clients' owners, agents, or employees have either been federally charged or are currently under investigation for unlawfully diverting controlled substances.

28.     DOUNN and WHOLESALE RX employees were also aware their Houston-area pharmacy clients' purchases of controlled substances indicated red flags of diversion, including that the pharmacy customers are primarily interested in the most potent, short-acting strengths of the Subject Opioids—primarily oxycodone 30 mg, and hydrocodone 10/325 mg, which are among the most highly sought-after drugs on the illegal drug market in the Houston area. Additionally, pharmacy customers primarily asked to purchase specific brands of oxycodone 30 mg, including "Alvogen," "Epic," and "KVK," which are blue in color, another red flag of diversion. Although the color of oxycodone 30 mg makes no medical difference, prior investigations into pill-mill clinics and pharmacies in Houston, Texas, have revealed that drug traffickers and users in the Houston area often prefer blue oxycodone 30 mg.

29.     In April 2021, DEA investigators interviewed a former employee of WHOLESALE RX. That individual advised the investigators that WHOLESALE RX mainly focused its sales on oxycodone 30mg and instructed WHOLESALE RX employees to "throw in fillers to meet the

ratio" meaning that each pharmacy order for controlled substances should contain non-controlled substances, often referred to as "fillers." The former employee stated that WHOLESALE RX utilized 1:4 ratio of controlled to non-controlled substances per order. The former employee also stated that he/she had raised concerns with WHOLESALE RX managers and/or officers that the DEA would be investigating because of the pattern of activity at WHOLESALE RX with regards to the Subject Opioids – those individuals advised the former employee "not to worry about it."

30.     WHOLESALE RX's business model is to purchase and sell controlled substances that are commonly diverted on the illegal market, while coaching individuals affiliated with WHOLESALE RX and client pharmacies on how to avoid detection by law enforcement by instructing them to: limit the number of orders for controlled substances; split their orders on multiple DEA-required forms to make it appear they are not ordering a large amount of the Subject Opioids in one transaction; and simultaneously order non-controlled substances to fit within certain ratios that do not require reporting to the DEA.

31.     Finally, although WHOLESALE RX is located in Tennessee, WHOLESALE RX supplies pharmacies located almost exclusively in Houston, Texas, a known hot-spot for pharmaceutical drug diversion. In fact, from on or about January 1, 2015, through on or about December 31, 2021, greater than 99% of WHOLESALE RX's hydrocodone 10/325 mg, oxycodone 30 mg, and hydromorphone 8 mg pills were distributed to pharmacies in Texas. Moreover, of the sales of ARCOS-reportable Subject Opioids to Texas pharmacies during that same period, greater than 97% of hydrocodone 10/325 mg pills, 99% of the oxycodone 30 mg pills, and 100% of the hydromorphone 8 mg pills were distributed to Houston-area pharmacies.

32.     In sum, WHOLESALE RX knowingly supplies controlled substances that are commonly diverted onto the illegal market and sells them to Houston-area pill-mill pharmacies,

while putting in place mechanisms (such as caps and ratios) designed to prevent law enforcement detection of the diversion rather than prevent diversion of controlled substances onto the illegal market. This is done in coordination with the individuals and entities named (and unnamed) in this complaint in order to facilitate the illegal trafficking of controlled substances and subsequent banking with the proceeds of that illegal trafficking.

<em>The Defendant Property is Subject to Forfeiture</em>

33.    The Defendant property is:

All funds on deposit in IberiaBank Free Business Checking account *******1014 (Account #1014) under the name of WHOLESALE RX INC, DBA TYLER PHARMACEUTICALS, 7730 Trinity Road, Suite 101, Cordova, Tennessee 38018.

34.    The Defendant property is funds from an operating account (Account #1014) utilized by WHOLESALE RX. Specifically, the funds are primarily debit and credit card payments from Houston-area pill-mill pharmacies to purchase controlled substances, deposited into WHOLESALE RX account by its payment processor. According to bank records, the credit and debit deposits from WHOLESALE RX's payment processor into Account #1014 from January 1, 2017, to November 30, 2021, total approximately $8,539,278.26. The investigation determined that approximately 99% of the funds processed by the payment processor were payments from Houston-area pharmacies; approximately 95% of the payments from pharmacies included are pharmacies listed in WHOLESALE RX's ARCOS data. The substantial majority of these funds are proceeds of the diversion and illegal trafficking of the subject opioids and opioid potentiators.

35.    Ultimately WHOLESALE RX and others known and unknown to the investigation utilized a series of corporate bank accounts and corporate entities, in order to create a veneer of legitimacy that helped to conceal the conceal or disguise the nature, source, ownership, and control of illegal drug proceeds. They did so by passing these unlawful drug proceeds through corporate

accounts and payment processors that appear, at least on their face, to be legitimate business accounts and activity. WHOLESALE RX also utilized the #1014 Account to promote the carrying on of specified unlawful activity; specifically to purchase controlled substances and/or pay operating expenses for the illegal sale and distribution of controlled substances. Additionally, WHOLESALE RX knowingly engaged in numerous transactions exceeding $10,000 of illegal drug proceeds in and out of the #1014 account.

36.     The funds in this account that constitute the Defendant property are payments made to WHOLESALE RX INC. for the sale of controlled substances that have been or will be diverted and illegally trafficked. Therefore, the funds in this account are both proceeds of the illegal distribution of controlled substances paid to WHOLESALE RX INC, and funds intended to be used to facilitate the purchase and illegal distribution of additional controlled substances.

37.     Furthermore, the funds in this account that constitute the Defendant property also constitute property involved in money laundering, specifically banking transactions involving proceeds of the diversion and illegal trafficking of controlled substances in violation of 18 U.S.C. §§ 1956, 1957.


## *NOTICE TO ANY POTENTIAL CLAIMANTS*

YOU ARE HEREBY NOTIFIED that if you assert an interest in the Defendant Properties which are subject to forfeiture and want to contest the forfeiture, you must file a verified claim which fulfills the requirements set forth in Rule G of the Supplemental Rules of Admiralty or Maritime Claims and Asset Forfeiture Actions.  The verified claim must be filed no later than thirty-five days from the date this Complaint has been sent in accordance with Rule G(4)(b).

An answer or motion under Rule 12 of the Federal Rules of Civil Procedure must be filed no later than twenty-one (21) days after filing the claim.  The claim and answer must be filed with

the United States District Clerk for the Southern District of Texas at United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002, and a copy must be served upon the undersigned Assistant United Sates Attorney at the United Sates Attorney's Office, 1000 Louisiana, Suite 2300, Houston, Texas 77002.

<u>*Relief Requested*</u>

The United States requests a judgment of forfeiture forfeiting the Defendant Property to the United States with such other relief to which the United States may be entitled.

Respectfully submitted,

JENNIFER B. LOWERY
United States Attorney

By:      *Brandon L. Fyffe*

Brandon L. Fyffe
Assistant U. S. Attorney
SDTX ID No. 3698129
1000 Louisiana, Ste. 2300
Houston, Texas 77002
Phone: (713) 567-9331
Fax: (713) 718-3300
brandon.fyffe@usdoj.gov

15

*Verification*

I, Gerrit Wolfhagen, Task Force Officer (TFO) with the United States Drug Enforcement Administration, hereby verify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the fact set forth in the foregoing Verified Complaint For Forfeiture In Rem are based upon either personal knowledge or from information, reports, or records obtained during investigation and from other law enforcement personnel, and are true and correct to the best of my knowledge and belief.

Executed on this 18th day of July, 2022.

Gerrit Wolfhagen
Task Force Officer
U.S. Drug Enforcement Administration

17